IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**MIRIAM E. MEDINA-AUGUSTO**,

     Plaintiff,

     v.                              Civil No. 14-1431 (BJM)

**COMMISSIONER OF SOCIAL SECURITY**,

     Defendant.

## OPINION AND ORDER

Miriam E. Medina-Augusto ("Medina") seeks review of the Commissioner's decision finding that she is not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C § 423, as amended, and filed a memorandum of law in support of her position. (Docket No. 17). Medina asks for judgment to be reversed and an order awarding disability benefits, or in the alternative to remand the case to the Commissioner for further proceedings. The Commissioner answered the complaint (Docket No. 12) and filed a memorandum. (Docket No. 21). This case is before me on consent of the parties. (Docket Nos. 4-6). After careful review of the administrative record and the briefs on file, the Commissioner's decision is affirmed.

## STANDARD OF REVIEW

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial

evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled.  20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982).  In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c).  If not, the disability claim is denied.  At

step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled.  If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity [1] ("RFC") and determines whether the impairments prevent the claimant from doing the work she has performed in the past.   If the claimant is able to perform her previous work, she is not disabled.  20 C.F.R. § 404.1520(e).  If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience.  If the claimant cannot, then she is entitled to disability benefits.  20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability.  *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform.  *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).  Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured.  *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

## BACKGROUND

Medina was born on November 1, 1973.  (Transcript ["Tr."] 22, 38, 662).  She completed high school, and worked as a cashier in a fast food restaurant, a factory worker in a boot factory, a toll collector, a cashier in a super market, and a security guard.  (Tr. 21-22, 41-44, 690-700). She claims to have been disabled since February 5, 2010 (alleged onset date) at 36 years of age[2] due to fibromyalgia, herniated lumbar disc, emotional problems, high blood pressure, stenosis, left knee and shoulder problems, hypoglycemia, asthma, dizziness, and pain in her knee, hip, arms, and waist.  Medina applied for a period of disability and disability insurance benefits on October 27, 2010, and last met the Social Security Administration's ("SSA") insured status requirements on December 31, 2012 (date last insured).  She did not engage in substantial gainful activity during this period.  (Tr. 15, 22, 4, 66-68, 586, 660-668, 673-674).

From 2005 to 2012, Medina received medical treatment through the State Insurance Fund ("SIF") for back pain and lumbosacral myositis.  She was treated with medications (Relafen, Norflex, Neurontin, Lodine, Flexeril), blocks, and physical therapy.  (Tr. 146-236, 251-294). Nurse's notes from 2005 to 2006 indicate that she would mostly arrive alone and walking without difficulty, although on February 28 and March 5, 2007 she was found to be walking slowly and with difficulty, with a mild anterior flexion of the trunk, and difficulty sitting.  (Tr. 170, 172, 175, 180, 184, 188-190, 195, 199, 215, 217, 219, 221, 224, 226, 228).  Records from August 21, 2006 show that, although she was in pain and had a muscle spasm, she had good balance, regular tolerance, no crepitation, a normal gait, and did not need an assistive device. (Tr. 210).  An MRI performed on November 18, 2006, showed degenerative disc disease and

---

[2] Medina was considered to be a younger individual (Tr. 22, 701), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

spondylosis on the lumbosacral spine.  (Tr. 202).  Another MRI of her lumbosacral spine, dated

November 10, 2007, showed small multilevel disc herniation at L1-L2, L2-L3, L3-L4, L4-L5,

and L5-S1, but no spinal canal stenosis.  (Tr. 179, 809).

On February 5, 2010 (alleged onset date), Medina slipped and fell at work,[3] injuring her

back and neck.  She returned to the SIF, where she was diagnosed with cervical and lumbar

strain, and was prescribed a muscle relaxant, pain relievers, and rest.  (Tr. 252-255, 905-907).

On February 18 and 23, the nurse observed that Medina was walking slowly but without

difficulty, and arrived accompanied. (Tr. 168, 261).  X-rays of Medina's cervical spine showed

early spondylosis, but normal intervertebral spaces, and x-rays of her thoracic spine showed

minimal scoliosis, early spondylosis, and anterior wedging suggesting mild compression.  X-rays

of her lumbar spine showed scoliosis, a lack of fusion of the posterior elements of the S1

vertebral body, and narrowing at the Ll-L2, L2-L3, L3-L4, L4-L5, and L5-S1 interspaces,

findings that are consistent with degenerative disc disease. (Tr. 256, 908).  On February 22, an

orthopedist diagnosed Medina with a status post left elbow contusion and cervical and lumbar

sprains, but no fracture, and prescribed medications for the pain, and referred her to a physiatrist

for therapy.  (Tr. 260-264, 910-913).  Although on April 15 she was observed walking with

difficulty, SIF physical therapy evaluation forms for that month reveal that, by the next day and

on follow-up visits in June and August, she walked without difficulty and felt little pain.[4] (Tr.

166, 265-279, 914-923, 925-928).

An MRI dated May 1, 2010, revealed disc bulges at the Ll -L2, L3-L4, and L5-S1 levels,

disc protrusions at L2-L3 and L4-L5, and degenerative disc disease at multiple levels, but no

---

[3] That day, Medina went to the *Policlinica del Atlantico emergency room*.  (Tr. 467-468)
[4] According to SIF progress notes, "little pain" ranges from one to three in a pain intensity scale
of zero to ten, ten being the worst.

stenosis or nerve impingement.  (Tr. 163, 794).  Another MRI dated August 21 revealed in her left shoulder a mild tendinosis of the supraspinatus tendon insertion and minimal acromioclavicular joint hypertrophy without impingement.  No surgery was recommended.  (Tr. 280-283, 929-932).  On November 8, she was observed walking slowly with difficulty, and felt moderate pain[5] and swelling in her cervical area.  (Tr. 285, 934).

In 2011, she continued to complain of pain in the lumbar region, with noticeable swelling, muscle spasms, and limited range of motion during follow-up visits as the SIF, and was walking accompanied and at times with difficulty and with moderate pain, other times without difficulty and with little pain.  (Tr. 287-289, 936-938).  On March 9, Medina had a slow semi-slanted gait with a left leg limp, was diagnosed with lumbosacral myositis, and was prescribed medications.  (Tr. 151-154, 785-788, 941, 943).  An electromyographic examination of her lower extremities performed on June 24 revealed no abnormalities.  (Tr. 148-149).  On July 6, an x-ray of Medina's left knee revealed normal mineralization of the osseous structures, no evidence of fracture or dislocation, and unremarkable overlying soft tissue.  (Tr. 294, 943).

The record also contains evidence of numerous emergency room visits from 2005 to 2012 to *Centro Isabelino de Medicina Avanzada*, *Hospital Buen Samaritano*, and *Policlinica del Atlantico* for her back pain.  She reported visiting the emergency room twice a week to receive relief for pain in her lower back that radiated to her legs.  (Tr. 93, 736).  Some of the later emergency room nurse's notes listed rheumatoid arthritis as part of her health history (Tr. 312, 361, 379, 486, 488, 579, 583) (or as a diagnosis (Tr. 388)), while most nursing notes listed herniated discs, asthma, and high blood pressure.  She would arrive walking, usually by herself, and was alert and oriented.  Her pain complaints were recurrent.  The pain was persistent and at

---

[5] "Moderate pain" ranges from four to six in a pain intensity scale of zero to ten.

times stabbing, and ranged from moderate to acute intensity, and intermittent or sometimes continuous frequency.  She manifested that nothing alleviated her pain.  Among the medications administered were intramuscular Toradol and Decadron.  (Tr. 302-341, 343-357, 361-363, 379, 388, 434-494, 579-584).   A lower extremities venous Doppler/Duplex study was performed on August 2, 2011, and revealed significant deep and superficial venous insufficiency of her right leg.  Her left leg was normal, and there was no sign of venous thrombosis above both knees.  (Tr. 971-974).  A lower extremities arterial Doppler/Duplex study revealed no evidence to suggest a hemodynamically significant stenosis, but did reveal mild atherosclerotic changes of the arterial walls through the lower extremities.  (Tr. 1214).   On June 19, 2012, Medina exhibited no atrophy, weakness, or abnormal walking gait. She had a full range of motion and good muscle strength. (Tr. 510).   On November 2012, Medina was diagnosed with fibromyalgia [6] and lumbalgia at *Centro Isabelino de Medicina Avanzada*.  (Tr. 580, 584, 1255-1260).

Dr. Samuel Mendez Figueroa, a consultative neurologist, evaluated Medina on April 13, 2011.  She complained of constant tenderness in the neck, shoulders, back, hips, legs, feet, knees, arms, elbows, and hands.  Dr. Mendez observed that Medina presented mostly unremarkable or normal body systems.  Medina had adequate motor bulk and no atrophy or spasm, but did have tender cervical and lumbar paraspinal muscles. Her strength was 4/5 symmetrically in all of her extremities, limited by pain.  She was able to grip, grasp, pinch, finger tap, write, button a shirt, and pick up a coin with either hand.  The tinel sign was negative.  Her gait was antalgic with a rigid spine, but she walked unassisted with no limping or foot drop.  Superficial reflexes and deep tendon reflexes were symmetrical.  Pinprick and proprioception were intact in all areas.  Her cortical functions were normal.  She was alert and fully oriented with adequate memory.  A

---

[6] Other emergency room notes from February 10, 2010, and July 24 and August 11, 2012 list fibromyalgia as part of Medina's health history.  (Tr. 363, 497, 583).

cervical spine and left knee x-ray performed for Dr. Mendez's consideration revealed an unremarkable cervical spine examination and minimal degenerative changes in her knee as expected for Medina's age with preserved joint spaces. He diagnosed Medina with chronic lumbalgia and cervicalgia, lumbosacral syndrome, and diffuse arthralgia with no sign of inflammatory changes. (Tr. 878-888).

Dr. Pedro Nieves, a state agency medical consultant, prepared a physical RFC assessment, dated May 10, 2011. He assessed that Medina could lift and/or carry twenty pounds occasionally, and ten pounds frequently. Medina could stand and/or walk about six hours in an eight-hour work day, with normal breaks. She could sit for about six hours in an eight-hour workday, with normal breaks. She could push and/or pull (including operation of hand and/or foot controls), but was limited in her lower extremities. She could frequently climb ramps/stairs and stoop. She could climb ladders, ropes, and scaffolds, and occasionally stoop, kneel, crouch, and crawl. She had no manipulative, visual, communicative, or environmental limitations. Dr. Nieves added that he did not find a medical source statement in the file regarding Medina's physical capacities. (Tr. 889-898).

Medina also briefly received psychiatric treatment. Dr. Ibzan Perez Muñoz treated Medina from September 2010 to March 2011, and diagnosed her with moderate to severe recurrent major depression without psychotic features, with a Global Assessment of Functioning ("GAF") of 50. On March 31, 2011, Dr. Perez reported that Medina had been facing mental illness throughout her life for different personal reasons, and that she stated to him that she lost her job because she was absent from work a lot after her fall, and that this depressed her. Dr. Perez noted that Medina's intellectual level was acceptable for her education. Medina's affect was adequate, her verbal behavior was acceptable, and her thought process was coherent,

relevant, and goal-directed, but her judgment was poor. She did not exhibit psychosis, suicidal ideas, delusions, paranoia, or ideas of reference.  Medina did accept that she was ill and sought help. Medina did not like taking part in social activities.  He found her to have poor judgment, poor functional capacity, and poor work capacity.  Medina was being treated with psychotherapy and anti-depressives but with poor remission.  He assessed that her work prognosis was poor, and that she had no ability to execute any task.  To him, she had no capacity for rehabilitation, but he had not referred her to vocational rehabilitation.  In his opinion, she met the criteria for disability. (Tr. 240-250, 502-504, 706, 867-877, 1178-1180).

On March 29, 2011, she was seen by Dr. Jorge Lopez-Nieves, who found her depressed and anxious, but coherent, oriented in the three axis, and presenting good judgment and insight. (Tr. 237-239, 864-866).

Dr. Hazel Toledo Espiet, consultative psychiatrist, evaluated Medina on May 7, 2011, and diagnosed Medina with a major depressive disorder, with a guarded prognosis. Medina was oriented, alert, and cooperative, but had a variable attention span with superficial insight and fair judgment. She also had psychomotor retardation, thought blocking, depressed mood, restricted affect, slow speed of speech, and ideas of worthlessness, helplessness, and hopelessness. Medina could assume full responsibility over her economic funds. (Tr. 899-902).

On July 13, 2011, Dr. Carmen Piñeiro, a state agency psychological consultant, prepared a psychiatric review technique form, and opined that Medina's mental condition did not meet or medically equal section 12.04 of the Listing of Impairments. She found that Medina had a medically determinable impairment, moderate major depression, with the following functional limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and

no episodes of decompensation. (Tr. 944-957). In a mental RFC assessment, Dr. Piñeiro assessed that Medina retained the mental RFC to understand, remember and carry out short and simple instructions, maintain attention and concentration for at least two hours, ask questions and request assistance, and respond to changes in a routine work setting. (Tr. 960-963).

On April 16, 2012, Medina went to APS Clinic, where she was diagnosed with a mood disorder and moderate recurrent major depressive disorder, prescribed medications, and referred for further psychological or psychiatric treatment.  (Tr. 380-383, 1058-1059).  However, there is no further evidence available in the record after this date, or record of psychiatric hospitalizations.

Additionally, in August and September 20, 2011, Medina provided information regarding her activities of daily living.  She reported being able to work eight hours straight per day before her conditions set in.  She claimed feeling sharp pains all over her body and numbness in her hands and legs, severe back pain, along with depression and anxiety, and that her conditions impeded her from walking a lot, driving, shopping, doing house work (trim the yard, clean the house, wash windows, do laundry, take care of her children, cook), and affected her ability to dress, bathe, care for her hair, feed herself, and use the toilet because of the pain she felt when she moved her arms.  She required help to perform these tasks.  She would feel back pain when she lifted, stood, walked, or sat.  She claimed only being able to walk a maximum of three minutes before having to stop and rest about 20 to 30 minutes.  When she does walk, she limps because of the pain in her back and spasms that don't allow her to bend.  She claims that she feels pain or numbness when she lifts, stands, walks, sits, reaches, or uses her hands.  She feels upper body pain when she reaches.  She cannot climb stairs, kneel, or squat.  She does not have strength in her hands. She does not use an assistive device.  She claims the pain impedes her

from concentrating, she has trouble remembering things (like her medications and medical appointments, or that she left the stove on), she gets easily discouraged so she cannot finish what she started (like chores or reading), and cannot follow spoken or written instructions.  She does not have problems getting along with bosses or other people in authority.  She also claims that her medications do not relieve or take away the pain.  Medina claims that she cannot stand or sit up for a long time because she feels severe pain from her neck to her feet, and that she cannot sleep because of pain and anxiety.  She takes Relafen, Celebrex, Neurontine, and Tentral twice a day each, but they don't relieve her pain.  She feels no motivation, nor wants to share time with her family.  (Tr. 86-127, 709-742, 752-763).

The claim was initially denied on July 20, 2011 (Tr. 66-68, 586, 593-596), and upon reconsideration on December 12. (Tr. 79-81, 587, 600-604, 609-611).   Medina requested a hearing before an ALJ (Tr. 612-613), which was held on November 16, 2012. (Tr. 34-65, 628-634). Medina, accompanied by counsel, testified that she was unable to work because of her strong back pain, that started at the neck and radiated down to her hands and legs, and that she felt numbness and cramps.  She testified that she has to go to the emergency room often because of the pain, that medications do not help, and that her doctor at the SIF decided not to administer more physical therapy, or injections or pain blocks, because they would stir up her pain, and only prescribed medications (pain relievers, muscle relaxants and anti-inflammatories) which upset her stomach. She rated her pain a nine out of ten, and that her pain improves only when she is given injections that put her to sleep.  Medina testified that, in an eight hour work day, she was able to remain seated for 15-20 minute intervals before having to get up, to stand for 40-45 minutes at a time, and to walk for six to eight minutes before having to stop.  She further testified

that she is able to lift objects like a bottle of water, a cup of coffee, or a bottle of shampoo. She cannot carry bags of groceries, and her sister-in-law does the household chores. (Tr. 44-55).

A vocational expert ("VE"), Dr. Ariel Cintron-Antommarchi, also testified.  Medina's past relevant work as a toll-collector, hand cementer of shoes and boots, and as a sandwich maker in fast food service were light unskilled work. Her work as food warehouse cashier and as a security guard was light, low semi-skilled. The ALJ asked two hypothetical questions. The first question was whether an individual with Medina's age, education, and work experience had the RFC to perform light work (lift or carry twenty pounds occasionally and ten pounds frequently, sit and stand for six hours in an eight-hour work day, with (1) frequent pushing and pulling with lower extremities, (2) occasional climbing of ladders, ropes or scaffolds, (3) occasional stooping, kneeling, crouching or crawling, (4) frequent balancing and climbing stairs and ramps), and unskilled work (simple routine repetitive tasks and carry out simple repetitive instructions with occasional contact with coworkers and the public). The VE answered that such a person would be able to perform one of Medina's past jobs, hand cementer, as well as plastic hospital product assembler and small product assembler II.

The second hypothetical question was whether a person with Medina's age, education, and work experience could perform sedentary work[7] (sit six hours in an eight-hour work day, alternate positions every two hours, occasionally and frequently lift/carry ten pounds, occasionally push/pull with the lower extremities, occasionally stoop/kneel/crouch/crawl, frequently keep balance, frequently climb stairs/ramps, but could not climb ladders/ropes/scaffolds) and unskilled work (performing simple, routine, repetitive tasks and

---

[7] Sedentary work involves lifting no more than ten pounds at a time, occasionally lifting or carrying articles such as docket files, ledgers, and small tools, and sitting for about six hours in an eight-hour work day. 20 C.F.R § 404.1567(a), SSR 96-9p.

carrying out simple, routine, repetitive instructions with occasional contact with coworkers and the public).  The VE answered that such a person would not be able to perform Medina's past relevant work, but there were several sedentary, unskilled jobs in Puerto Rico that Medina could perform: eyeglass frame polisher, final assembler of optical goods, and addressing clerk or envelope clerk. The VE added that such a person could also perform these jobs even if she had to alternate positions every two hours because these jobs allow rest every two hours. She would not be able to perform these jobs if she had to alternate positions every fifteen minutes. (Tr. 22-23, 56-64, 624-627, 649).

On February 1, 2013, the ALJ found that Medina was not disabled under sections 216(i) and 223(d) of the Act.  (Tr. 13).  The ALJ sequentially found that Medina:

(1) had not engaged in substantial gainful activity since February 5, 2010 (Tr. 15);

(2) had severe impairments of the spine, fibromyalgia, rheumatoid arthritis, cervicalgia, a history of deep and superficial right venous insufficiency, and depression (Tr. 15);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526 (Tr. 16);

(4) could not perform past relevant work but retained the RFC to perform a range of sedentary (occasionally and frequently lift and carry ten pounds, sit six hours in an eight-hour workday, stand or walk two hours in an eight hour workday, with occasional pushing/pulling with the lower extremities, occasional stooping/kneeling/crouching/crawling, frequent balancing and climbing stairs or ramps, no climbing ladders/ropes/scaffolds, and had to alternate positions

every two hours) and unskilled work[8] (simple, routine, repetitive instructions with occasional contact with coworkers and the public) (Tr. 18); and

(5) could perform other jobs in the national economy as per her age, education, experience, and RFC, as per the medical Vocational Rule 201.28 and the vocational expert testimony, and therefore, was not disabled.

The ALJ's decision considered both the medical-vocational guidelines and the VE's testimony, along with all the medical evidence in the record.[9]  In determining Medina's RFC, the ALJ stated that there was objective evidence of (1) lumbar scoliosis, a lack of fusion of the posterior elements of the S1 vertebral body, and narrowing of the lumbar and L5-S1 interspaces, consistent with degenerative disc disease, (2) lumbar disc bulges, and (3) early spondylosis of the cervical spine, minimal thoracic scoliosis and early spondylosis of the thoracic spine with an anterior wedging of the T12 vertebral body that suggested a mild compression, along with Medina's complaints and symptoms. (Tr. 20). The ALJ also found that Medina's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning intensity, persistence and limiting effects of the symptoms were not credible to the extent they are inconsistent with the RFC finding. (Tr. 20). Having found that Medina had the RFC to perform a full range of sedentary work, in conjunction with her age, education, and work experience, the ALJ noted that medical-vocational Rule 201.28 directed to a finding of not disabled, as per 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00(e)(2) and 20 C.F.R. § 404.1569.  (Tr. 22).

---

[8] Medina does not contest in her memorandum the ALJ's non-exertional RFC finding.
[9] Medina does not argue in her memorandum that the ALJ erred in the use of the medical-vocational guideline.

In sum, the ALJ determined at step five of the sequential evaluation process that Medina was not disabled and could perform other alternate work despite of her severe existing conditions. (Tr. 7-29).

On April 2, 2014, the Appeals Council denied Medina's request for review of the ALJ's decision, and rendered the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

## DISCUSSION

The court must determine whether there is substantial evidence to support the ALJ's determination at steps three and five in the sequential evaluation process contained in 20 C.F.R. § 404.1520, that based on Medina's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act.

Medina argues that the ALJ did not deploy the correct legal standards. Medina specifically claims that, although the ALJ recognized her fibromyalgia and rheumatoid arthritis as severe impairments, she did not discuss why she considered that these conditions did not meet or medically equal, alone or in combination with her other impairments, one of the listed impairments in 20 C.F.R. Par 404, Subpart P, Appendix 1, or why they did not preclude substantial gainful activity. Medina also challenges the ALJ's assessment of her credibility as to the pain she claims she felt, and argues that the ALJ offered no instances of her treating physicians discrediting her pain complaints, or good reasons to disregard the treating physicians' opinions, as per 20 C.F.R. §§ 404.1527(d) and 404.1527(f)(2)(i), and SSRs 96-2p and 96-8p.

"Fibromyalgia is defined as '[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.' Further, '[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities.'" *Johnson v. Astrue*, 597 F.3d

409, 410 (1st Cir. 2009) (per curiam) (citations omitted).  The SSA acknowledges through SSR 12-2p that fibromyalgia may be a disabling condition, but there must be sufficient objective evidence to support a finding that a claimant's impairment(s) so limits her functional abilities that it precludes her from performing any substantial gainful activity.  *Barowsky v. Colvin*, 2016 U.S. Dist. LEXIS 19118, *12 (D. Mass. Feb. 17, 2016) (*quoting SSR 12-2p*, 2012 SSR LEXIS 1, 2013 WL 3104869).  SSR 12-2p provides step-by-step guidance on how to evaluate fibromyalgia in disability claims.  It also establishes the general criteria that a claimant (who has the burden of proof at steps one through four) may use to establish that she has a medically determinable impairment of fibromyalgia.  The evidence provided must be from an acceptable medical source, and that evidence must not only contain the diagnosis (the policy specifically says that the SSA "cannot rely upon the physician's diagnosis alone"), but also a review of the claimant's medical history, physical exam(s), treatment notes consistent with the diagnosis, and an assessment of physical strength and functional abilities.  However, neither Medina nor the ALJ address this ruling.  Even so, that does not mean that there is no substantial evidence to support the ALJ's steps three through five findings.

Medina quotes *Johnson*, arguing that once the ALJ accepted the diagnosis of fibromyalgia, "she also '*had no choice* but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms.'" *Johnson*, 597 F.3d at 414 (*quoting Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994)) (emphasis and alterations in original).  Be that as it may, Medina's "'argument seems rooted in the mistaken belief that the symptoms and signs of fibromyalgia are *per se* disabling.'"  *Barowsky*, 2016 U.S. Dist. LEXIS 19118, at *18 (*quoting Mariano v. Colvin*, 2015 U.S. Dist. LEXIS 174481, *9

(D.R.I. Dec. 9, 2015)).  The ALJ is required to consider all of the evidence of record when weighing Medina's subjective claims of pain, to resolve conflicts in the evidence, and draw reasonable conclusions from the record.  *Barowsky*, 2016 U.S. Dist. LEXIS 19118, at *18 (citations and quotations omitted).

Here, emergency room records show that Medina was diagnosed with fibromyalgia sometime between 2010 and 2012.  The ALJ acknowledged the fibromyalgia diagnosis and considered the condition a severe impairment at step two.  In the step-three (listed impairments) analysis, the ALJ stated that, although Medina had severe physical impairments (without specific mention to her fibromyalgia or rheumatoid arthritis, or any other condition), these did not meet the criteria of any of the listed impairments in 20 C.F.R., Subpart P, Appendix 1, and that the record did not contain findings by the treating sources that were equivalent in severity to the criteria of any listed impairments, nor was there evidence in the record to support such a finding. SSR 12-2p provides that "[a]t step 3, we consider whether the person's impairment (s) meets or medically equals the criteria of any of the listings  in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix 1).  [Fibromyalgia, "FM"] cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."  Here, the ALJ at step three found, without elaboration, that Medina's impairments were not equivalent to any of the disabling listed conditions. [10]

---

[10] The ALJ's step-three analysis of Medina's physical impairments is limited to one paragraph, as stated above.  In contrast, the ALJ's step-three analysis of Medina's mental impairments is more thorough.

Courts differ in the extent to which at step three the ALJ must discuss whether the claimant's severe conditions medically equaled a listing, and whether failure to do so constitutes harmless error in view of the ALJ's discussion of the evidence at subsequent steps.  Some courts have remanded for further proceedings because the ALJ did not discuss the equivalency determination.  *See, e.g., Stratton v. Astrue*, 987 F. Supp. 2d 135 (D.N.H. 2012) (remanding because the ALJ failed to mention and elaborate as to which disability listings were considered in the equivalency determination process of the plaintiff's asthma); *Morgan v. Colvin*, 2015 U.S. Dist. LEXIS 77632, *13-14 (N.D. Ala. June 16, 2015); *Eller v. Colvin*, 2015 U.S. Dist. LEXIS 96030, *9-12 (M.D.N.C. July 22, 2015); *Cashin v. Colvin*, 2013 U.S. Dist. LEXIS 101308, *14 (N.D. Ohio June 17, 2013) (remanding because the ALJ did not properly consider other listings at step three as per SSR 12-2p).  Others do not.  *See, e.g., Marshall v. Colvin*, 2014 U.S. Dist. LEXIS 119450, *38-40 (D.N.H. 2014) (affirming because although the ALJ did not reference specific evidence to support the step-three determination as to the claimant's cerebral trauma, the decision as a whole supported the finding); *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) (per curiam); *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005) (affirming because the ALJ's analysis at subsequent steps provided a basis for upholding the step-three finding in spite of any deficiency in articulation reasoning at that step;  *Cox v. Colvin*, 2015 U.S. Distr. LEXIS 167126, *28-30 (N.D. Cal. Dec. 14, 2015); *Erickson v. Colvin*, 2014 U.S. Dist. LEXIS 139798, *8-9 (E.D. Cal. Sept. 30, 2014) (affirming the step-three analysis because although the ALJ did not specifically address the claimant's fibromyalgia, the claimant did not meet the burden of proof by pointing to any listing she believed her impairment equaled,  addressing the standard for meeting that listing, or citing evidence in the record in support of her argument).

As mentioned, the ALJ at step three did not specifically evaluate whether Medina's FM was equivalent to a specific listed impairment.  I find this error to be harmless in light of the ALJ's findings as to Medina's RFC and pain, which are supported by substantial evidence.  I also note that the diagnosis of FM appears in hospital records without any supporting substantial evidence.  And I note that Medina, who has the burden at step three, has failed to point to a specific listed impairment that she claims is equivalent to her history of FM.

Moving to steps four and five, SSR 12-2p provides that, when assessing a claimant's RFC, the ALJ shall additionally "consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"  The longitudinal evidence shows that a lot of her musculoskeletal and neurological examinations and laboratory rendered unremarkable results with no significant showing of impediment to her ability to physically perform, and that the consultative neurologist, Dr. Mendez, observed that Medina presented mostly unremarkable or normal body systems, and yet she was constantly being medicated for mild to acute pain.  However, I note that the medical evidence also portrays a claimant whose symptoms and pain levels fluctuated throughout a record that spans around twelve years, that is, the record shows that, with regards to self-reported pain intensity, Medina had good days and bad days, from mild to acute pain according to the SIF and emergency room records, her testimony before the ALJ, and her report about her activities of daily living, and that the medications only offered temporary relief, as she kept constantly returning to emergency rooms for pain relief.

That said, the ALJ's RFC discussion does not address Medina's fibromyalgia history or make specific findings as to that condition, understandably so, as it only appears mentioned in an emergency room record as her last diagnosis in 2012, at the end of the record.  Her treating

physicians at the SIF do not mention fibromyalgia in the treatment notes, and rheumatoid arthritis is only mentioned as part of her medical history, nor did the treating doctors provide a RFC assessment, but they did not discredit her pain complaints, either, and offered her an array of treatments (physical therapy, blocks, intramuscular injections, oral medications) to deal with her pain concerns, which she responded to favorably, although temporarily, as she kept returning for further treatment. The record also reflects that she was able to walk, unassisted at all times, and mostly without difficulty.  Dr. Mendez observed that she had no manipulative limitations and some strength limitations in her extremities because of her pain.  The ALJ compared Medina's subjective self-reported pain symptoms to the objective medical evidence available in the record and the consultative neurologist's physical evaluation to determine whether her conditions could reasonably be expected to produce her pain and other symptoms, and I find that the record supports the finding that Medina's symptoms are not credible to the extent they are inconsistent with the RFC assessment.

As to the weight of the evidence, the ALJ should give "*more* weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)."  20 C.F.R. § 404.1527(d)(2).  In addition, controlling weight must be given to a medical treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  Also, under the "good reasons" requirement, "the notice of determination must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight." SSR 96-2p.  The weight the ALJ gave to the treating

sources is not discussed in the decision but, again, they did not offer RFC assessments to be

considered.  The ALJ did state that great weight was given to Dr. Mendez because he performed

a comprehensive evaluation of the claimant supported by clinical signs.  So, although the ALJ

did not include a discussion as to the weight given to the treating sources, as required under the

"good reasons" requirement of 20 C.F.R. § 404.1527(d)(2), she did state what evidence she

considered in her findings, specifically citing record evidence from the SIF, the emergency room

records, and Dr. Mendez.  I find that no prejudice was caused to the claimant, and remanding the

case for further elaboration would serve no additional purpose.

The function of weighing evidence and determining if a person meets the statutory

definition of disability is the Secretary's, 20 C.F.R. § 404.1527(d), and, as discussed in this

opinion, there is substantial evidence in the record to support the ALJ's final determination.  The

ALJ was required to consider all of the evidence of record when weighing Medina's subjective

claims of pain, to resolve conflicts in the evidence, and draw reasonable conclusions from the

record.  *Barowsky*, 2016 U.S. Dist. LEXIS 19118, at *18 (citations and quotations omitted).

While Medina "'plainly suffers from fibromyalgia, the ALJ concluded, based on substantial

evidence in the record, that it did not render her disabled.  And, [she] supportably found that

claimant's assertions to the contrary were not entirely credible.'"  *Id.*, at *18-19 (*quoting Hebert

v. Colvin*, 2014 U.S. Dist. LEXIS 108063, *8 (D.N.H. Aug. 6, 2014)).  There is substantial

evidence in the record to support the ALJ's final determination.

## Conclusion

For the foregoing reasons, the Commissioner's decision is affirmed.  Judgment shall be

entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of February, 2016.


*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge